**UNITED STATES of America,**
v.
**George KLEINMAN, Defendant.**
Crim. No. 43999.

United States District Court
E. D. New York.
Nov. 17, 1958.

See also 19 F.R.D. 423.

Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y., for the Government. Morton Schlossberg, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

Morris K. Siegal, New York City, for defendant. Vincent J. Crowe, New York City, of counsel.

ZAVATT, District Judge.

The indictment is in four counts, three of which (Counts One, Three and Four) were dismissed upon the motion of the Government made during the trial to the Court without a jury. The trial proceeded as to Count Two which charges that in 1950 the defendant filed a false and fraudulent joint income tax return on behalf of himself and his wife for the calendar year 1949, wherein it was stated that their net income for that calendar year was $6,141.69, and that the amount of tax due thereon was $621.12, whereas the defendant knew that their net income for that calendar year was $20,-225.46, upon which there was owing to the United States an income tax of $3,-

955.78. The indictment charged the defendant with willfully attempting to evade and defeat a large part of the income tax owing by him and his wife in 1949, in violation of Section 145(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 145(b).

On January 10, 1956 the Government furnished a bill of particulars stating that its proof on its direct case would be based upon the "net worth expenditure theory", and that it would show the defendant's approximate net worth at the beginning of 1949 to be $56,718.33, and at the end of 1949 to be $72,044.71. Upon the trial the Government sought to prove that the opening net worth of the defendant was $56,718.33, as stated in the bill of particulars (The defendant offered to stipulate to the accuracy of this figure. Inasmuch as it was to the defendant's advantage to have the Government's opening net worth figure as high as possible, the offer to stipulate is not viewed as an admission of the items of which this figure was comprised.), and that his taxable income for 1949 was the difference between this figure and an asserted closing net worth of $71,-044.71, plus the amount of $6,899.08, which the Government contended and the defendant did not deny to be the defendant's estimated living expenses in 1949. In other words, the Government sought to prove that the defendant's taxable net income in 1949 was $21,225.46, and that after reporting income of $6,824.10, the defendant had an unreported income for 1949 of $14,401.36.

The net worth method of proof has been described in Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, as being employed in a typical prosecution in the following manner:

"* * * the Government, having concluded that the taxpayer's records are inadequate as a basis for determining income tax liability, attempts to establish an 'opening net worth' or total net value of the taxpayer's assets at the beginning of a given year. It then proves in-

creases in the taxpayer's net worth for each succeeding year during the period under examination and calculates the difference between the adjusted net values of the taxpayer's assets at the beginning and end of each of the years involved. The taxpayer's nondeductible expenditures, including living expenses, are added to these increases, and if the resulting figure for any year is substantially greater than the taxable income reported by the taxpayer for that year, the Government claims the excess represents unreported taxable income. In addition, it asks the jury to infer willfulness from this understatement, when taken in connection with direct evidence of 'conduct, the likely effect of which would be to mislead or to conceal.' " 348 U.S. 121, 125, 75 S.Ct. 127, 130.

It was pointed out in Holland that the pitfalls which are basically inherent in such a method of proof of tax evasion require the exercise of great care and restraint in its use. Despite the permissible use of the method it must be remembered that "the Government must still prove every element of the offense beyond a reasonable doubt though not to a mathematical certainty. The settled standards of the criminal law are applicable to net worth cases just as to prosecutions for other crimes." 348 U.S. 121, 138, 75 S.Ct. 127, 137.

■■■ It is firmly established that increases in net worth, standing alone, cannot be assumed to be attributable to taxable income; that there must be evidence to support such an inference. In Holland it was held that it is sufficient for this purpose for the Government to prove a likely source of taxable income from which a jury could reasonably find the net worth increases sprang. In United States v. Massei, 1958, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517, it was stated that there would be no necessity for proof of a likely source in a case in which the Government could negative "all possible sources of nontaxable in-

come." And in United States v. Adonis, 3 Cir., 1955, 221 F.2d 717, it was held that the defendant's deliberate falsification as to alleged nontaxable sources of receipts to explain large expenditures or accumulations was a legally acceptable circumstantial showing that the funds acquired during the taxable year were derived from taxable income. Furthermore, as pointed out in Holland:

"The statute defines the offense here involved by individual years. While the Government may be able to prove with reasonable accuracy an increase in net worth over a period of years, it often has great difficulty in relating that income sufficiently to any specific prosecution year. While a steadily increasing net worth may justify an inference of additional earnings, unless that increase can be reasonably allocated to the appropriate year the taxpayer may be convicted on counts of which he is innocent." 348 U.S. 121, 129, 75 S.Ct. 127, 132.

That is, there must be a basis for concluding that unreported income was realized in the year for which the prosecution was based and was not acquired in any earlier year, United States v. Adonis, supra, 221 F.2d 721, for, as stated in United States v. O'Malley, D.C.E.D.Pa. 1955, 131 F.Supp. 409, 414:

"The defendant may well have over a period of years substantially increased his net worth and on a basis which may have involved understatement of taxable income. However, in a criminal prosecution for income tax evasion in a particular calendar year, the Government is not permitted to allocate summarily such unaccounted-for accretions to a particular year without meeting the requirements laid down in the Holland and Adonis decisions. * * "

In the instant case the Government proved that the defendant's net worth as of December 31, 1943 was $2,180.72. It claimed that its evidence established an-

nual increases in his net worth thereafter as follows:

| 1944 | $ 5,292.67 |
| 1945 | 8,583.57 |
| 1946 | 14,538.25 |
| 1947 | 12,551.17 |
| 1948 | 13,571.95 |
| 1949 | 14,326.38 |

The Government did not show the defendant's living expenses in the years 1944 through 1948. It was shown, however, that the Government's claimed net worth increases in those years exceeded the defendant's reported income for those years in the following amounts:

| 1944 | $1,943.64 |
| 1945 | 4,495.74 |
| 1946 | 9,890.57 |
| 1947 | 7,448.59 |
| 1948 | 7,489.15 |

As stated previously, the Government claimed that the defendant's living expenses in 1949 plus his claimed net worth increase in that year exceeded his reported income for that year by $14,401.36.

 The defendant's father, Bernard Kleinman, died in 1954. Beginning in 1944, and throughout the years from 1944 through 1949, savings bank accounts were opened in the father's name. Approximately $55,000 was deposited in these accounts during these years, and from these accounts approximately $50,000 was subsequently, and within the years mentioned, transferred to the defendant or to members of his family. This was accomplished in part by the transfer of cash by check from Bernard Kleinman to the defendant and members of his family, and in part by the transfer of assets from Bernard Kleinman to the defendant, which assets had been purchased with funds deposited in these savings bank accounts. It was the Government's theory that all of the deposits made in the name of the defendant's father were, in effect, additions to the defendant's net worth, i. e., that the funds belonged to the defendant from the dates of deposit, and were merely held in the father's name. It was the Government's foremost burden, therefore, to establish this element of its case by affirmative proof. The inference that an increase in net worth may be equated with unreported income in a given year must rest at least upon a clear and convincing showing that the items claimed in the Government's net worth computation are in fact the assets of the defendant. All of the cases which have come to the Court's attention support this conclusion.

In Adonis, upon which the Government relies, the Government proved that in 1948 the defendant expended amounts aggregating some $44,000 for the purchase of a parcel of land and the building and furnishing of a home thereon. The Court of Appeals for the Third Circuit noted that "The evidence of the payment of this much money in 1948 for land, building and furnishings was clear, precise and uncontroverted." 221 F.2d 717, 718. In United States v. Ford, 2 Cir., 1956, 237 F.2d 57, vacated upon suggestion of mootness, Ford v. United States, 1957, 355 U.S. 38, 78 S.Ct. 114, 2 L.Ed.2d 71, the Court was of the view that the specific items reflected in the Government's net worth chart "were based on undisputedly sufficient evidence." 237 F.2d 57, 59. And it is later noted in the same opinion that the figures noted on the Government's net worth chart "were independently supported and were never challenged." Ibid., 63.

In the instant case the defendant was employed as an agent of the Internal Revenue Service from 1935 until 1951. It should be stated preliminarily that this is a case involving no specific items of allegedly unreported income. It appears that the defendant filed returns for and paid income taxes upon his salary as an agent and upon capital gains, interest and dividends earned by him during these years.

With regard to a possible source of income to support an inference that the defendant acquired legally or otherwise,

the funds which found their way into the Bernard Kleinman accounts, there has been an insinuation pervading this proceeding that such funds are the fruits of the defendant's graft-taking. To begin with, it has never been suggested that the defendant had any other lawful occupation or business, disclosed or undisclosed, from which such funds could have derived. The failure of the Government's investigation to uncover any such occupation or business excludes a hypothesis that the defendant's alleged affluence may be attributable thereto. On the other hand, a theory that the defendant accepted bribes appears to be that upon which the Government conducted its investigation. The Special Agent who investigated this case testified that he examined taxpayer's returns which had been audited by the defendant; that he spoke to some three hundred of such taxpayers, and investigated taxpayers who prepared returns audited by the defendant. No one was brought forward to testify that the defendant had taken a bribe or had offered to take a bribe. The Government in the late hours of the case candidly advised that it does not ask the Court to assume that the unreported income of the defendant was received through bribes. The net result is that there is a void as to a showing of a possible source of unreported income, and the persuasive value which such a showing might have is replaced only by speculation of no probative value whatever.

There is no evidence that the defendant ever physically deposited funds in the Bernard Kleinman accounts. He denies that he ever did so. The only conclusion which can be reached upon this record is that the physical acts of making deposits were performed by Bernard Kleinman himself. Furthermore, there is not a scintilla of evidence to establish that the defendant turned over moneys to his father, which were deposited by the latter in accounts in his name. Nor is there anything to show affirmatively that the two acted in collusion to disguise the defendant's income as his father's savings for the purpose of evading income taxes or for any other purpose.

Two facts are worthy of mention at this point. From the middle of 1946 until the latter part of 1947 the defendant was assigned in connection with the performance of his duties to posts in Phoenix, Arizona and Los Angeles, California. During this period approximately forty-eight deposits totalling some $13,700 were made in the Bernard Kleinman accounts in Brooklyn and in New York City. Assuming, arguendo, that these were deposits of the defendant's funds in the continued pursuit of a conspiracy in his behalf, in the absence of evidence indicating the actual state of facts, it is as reasonable to conclude that this was the systematic disposition by the father of a hoard accrued by the defendant in some prior period, as it is to conclude that the funds were the current unreported earnings of the defendant transmitted to his father in some unknown manner. If such was the case, it may have been the case in the year 1949, with which we are primarily concerned, and in such event it would be clearly erroneous to assimilate deposits in the Bernard Kleinman accounts with current unreported income of the defendant. Secondly, it appears that in 1947 Bernard Kleinman received $990 as the proceeds of a twenty-year endowment policy and deposited this amount in one of the aforementioned accounts in his name. This was included in the balance of said account which was assigned to the defendant's net worth for that year as calculated by the Government. I cannot perceive how this can be counted as an asset of the defendant at that time. But it is perhaps more significant that the deposit of these proceeds clearly indicates that if the Government's theory is correct, the funds of Bernard Kleinman were combined with those of the defendant in the bank accounts in question, but to an unknown extent. Bernard Kleinman was gainfully employed from at least 1944

through 1949. He lived frugally with his unmarried daughter who had her own income. He had no dependants during this period and for an undetermined period prior thereto. If he deposited $990 of his funds in these accounts it is fair to infer that he may have deposited other savings therein. And if this is so, the Government's charts are an unreliable calculation of even the defendant's approximate net worth throughout the period here involved.

Essentially, the Government has attempted to establish these funds as the assets of the defendant in the following manner: (1) It has shown that within a short time after the deposits were made the funds or their proceeds were transferred to the ostensible control of the defendant and members of his family and that the defendant did, in fact, exercise dominion over the funds and use them for his benefit. (2) It attempted to show the defendant's allegedly willful fabrication as to the source of the funds coming into his possession. Upon the trial the parties were asked to brief the question of whether, if the Court disbelieved the defendant's testimony as to the source of the funds in his possession such disbelief would amount to proof of the contrary, inasmuch as the contrary was part of what the Government had to prove in its affirmative case. The Government appears to rely only upon United States v. Adonis, supra, to support the affirmative of this proposition. There, there was a "clear and impressive showing" that the defendant willfully misrepresented the source from which he obtained large amounts of money. In Ford it was noted that such *proof* of fabrication was itself some affirmative evidence of guilt, the Court of Appeals stating:

 " * * * Of course, standing alone, such evidence would not be sufficient to support a conviction. But when coupled with extensive affirmative proof of tax evasion under the net worth method, it may suffice. * * * " 237 F.2d 57, 63, footnote 10.

In the instant case there was evidence that for years before the Bernard Kleinman accounts were opened, Bernard Kleinman maintained a safe-deposit box, and that in 1941, at the time Bernard Kleinman suffered a heart attack, he was carrying approximately $1,000 upon his person. The exact number of years in which he was employed is not known, but it would appear that he worked all his life until a few years before his death in 1954 at age 77. Bernard Kleinman's income tax returns show that he earned between two and three thousand dollars a year from 1945 through 1949. The defendant testified that during the 1940's his father earned about $50 per week, and that prior to that period he earned more. The defendant's mother worked for fifteen years prior to her death in 1929, and earned about $35 per week which she gave to her husband. The defendant and his two sisters started working at a young age and turned money over to their father. It appears that one of the sisters lived with Bernard Kleinman until his death and was employed throughout this period. Before 1930 the family lived in an apartment on the Lower East Side of New York at a rental of fifteen to twenty dollars per month. After the death of the defendant's mother the family moved to a Brooklyn apartment, where Bernard Kleinman lived until his death, at a maximum rental of $35 per month. The defendant testified to the frugal manner in which his father lived, and there was no evidence brought forward by the Government of improvident or excessive expenditures by Bernard Kleinman.

Government investigators were aware of what was later the defendant's testimony upon the trial, and in August, 1952, interviewed and took a statement from Bernard Kleinman. The substance of this interview was not brought out upon the trial (principally because of the Government's objection thereto), but it does appear that Bernard Kleinman told the investigator that he had lived frugally and had been able to accumulate the money in his bank accounts,

which were his savings over a long period of years. Investigation was then made as to Bernard Kleinman's last employment, and as to the rent which he had paid in previous years. The Government did not, upon the trial, establish Bernard Kleinman's income for years other than 1945 through 1949, nor did it show his living expenses at any time. There was no direct testimony by the Special Agent as to the rent which Bernard Kleinman was paying, but on cross-examination it was shown that the information which he received did not necessarily contradict the defendant's claims in this regard. The Government attempted to introduce Social Security records pertaining to Bernard Kleinman, but these were not properly authenticated and were excluded upon the defendant's objection.

On the other side of the coin, it was shown that in a statement filed in 1935 the defendant indicated his father as a dependent. In a letter to his draft board in 1943 the defendant claimed that his salary was used partially to support his father. The defendant's testimony was that in 1944 he learned that his father had a large hoard of money which his father told the defendant he had saved; that the defendant advised him to put it into the bank a few hundred dollars at a time to avoid investigation by the Treasury Department; that in 1946 he told his father that inheritance and gift taxes could be avoided if his father were to turn over, in his lifetime, about $12,-000 per year to the defendant and the three members of his family; that the transfers to the defendant were in pursuance of this scheme; and that there was an understanding between the defendant and his father that the defendant was to stand in the place of his father and hold the money for the benefit of himself and his two sisters, as it was needed. This testimony is, at best, unlikely. It is difficult to believe that Bernard Kleinman, on his income as we know it, could have accumulated savings of $55,000. It is important to note, however, that the Government's evidence merely established the improbability of this fact. It does not establish its falsity. It is further, difficult to believe that if Bernard Kleinman were the type of individual who was willing and able to accumulate $55,000, he would have disposed of it in the manner claimed herein. Further, it was testified that none of the funds went to the defendant's sisters during their father's lifetime. It was shown that the funds in the hands of the defendant were dealt with by him as his own, and in a manner wholly inconsistent with any obligations of trust.

■ It thus appears that the defendant's explanation of the origin of the funds and the reason for and manner of their transfer to his control is unlikely, contradictory, and provides the basis for its own refutation. Cf., United States v. Nunan, 2 Cir., 1956, 236 F.2d 576, certiorari denied, 1957, 353 U.S. 912, 77 S.Ct. 661, 1 L.Ed.2d 665. But this is far from the "clear, precise and uncontroverted" proof of expenditures found in Adonis [221 F.2d 718], or the "undisputedly sufficient," "independently supported," and "never challenged" evidence of the Ford case. Other cases in which assets held in the names of third persons were attributed to the defendant indicate the quantum of proof which is requisite in this situation.

In O'Connor v. United States, 4 Cir., 1953, 203 F.2d 301:

"There was, however, evidence tending to show that the property which appeared on the land records in the the names of husband and wife had actually been purchased with the defendant's funds. The persons who negotiated the sales testified that they dealt with the defendant alone, and the settlement sheets made no reference to the wife but indicated that the properties were bought for the account of the defendant. Furthermore the defendant's income returns for the years 1944 to 1946 showed that his wife had no income during this peri-

od; and when he took the stand as a witness he made no claim that his wife had contributed to the purchase price. She herself was not produced as a witness. * * *" 203 F.2d 301, 303.

In Smith v. United States, 1 Cir., 1954, 210 F.2d 496, affirmed, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192, there was charged to the defendant's net worth an annuity, real estate, stocks and bonds, and bank accounts held in the name of his wife, and jointly in the name of his wife and her brother. The latter testified that he had no interest in any of these accounts. In that case a written statement was introduced in evidence showing the defendant's net worth at the beginning and end of the years in issue. This had been prepared by the defendant's accountant and had been signed by the defendant. There was evidence of verbal admissions of ownership of assets by the defendant. The Court found ample corroborating evidence of the written and verbal statements of the defendant which "accurately fixed his net worth" at the beginning of the prosecution period "and revealed substantial increases in his net worth above what he reported as taxable income in his tax returns for the years in issue." 210 F.2d 496, 499.

In United States v. Costello, 2 Cir., 1955, 221 F.2d 668, affirmed Costello v. United States, 1956, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397, the defendant alleged error in permitting the jury to include his wife's expenditures in the prosecution years as part of his own. The Court of Appeals stated:

" * * * As to his wife's income, the evidence justified a finding that the money had not come out of it, except in 1946 when she was credited with about $16,000 gross income, which she separately returned. In 1937 Costello had sworn that she had no income; in 1939 that, whatever money went into her bank account, he gave her; and in 1943 he told his lawyer that in 1941 she bought a motor car with his money, as well as 'all the living expenses.' In applying for insurance in 1940 she stated that she was supported by her husband. Furthermore, the prosecution traced many cheques received by him into her bank account and in 1943 two payments of Costello's estimated income tax were paid out of her account. From all this it was a permissible inference that in the four 'indictment years' she had no separate income beyond what was credited to her in 1946." 221 F.2d 668, 672.

The Court held that this evidence "standing uncontradicted as it did" was sufficient to support an inference that Mrs. Costello's purchases were made out of her husband's money. 221 F.2d 668, 674.

█ The Supreme Court has warned that the use of the net worth method requires the exercise of great care and restraint. Holland v. United States, supra. Where a conviction for tax evasion is sought by equating an increase in net worth with unreported taxable income, caution demands that proof of the defendant's alleged ownership of the assets included in the final net worth figure be made by clear and convincing evidence. The Court is aware of no case applying a less stringent standard. Here, while it must be said that the Court cannot give credence to the defendant's claims, the Court is not satisfied that the improbabilities inherent in the defendant's explanation which bar acceptance of his claims amount to clear and convincing evidence that the funds in question originated with the defendant, that is, that Bernard Kleinman merely held the accounts as the agent or proxy of his son.

Assuming, again arguendo, that all of the funds deposited in the Bernard Kleinman accounts belonged to the defendant, as the Government contends, there would remain the question of whether such deposits represented cur-

rent income. In Holland it was shown that although the business of the hotel operated by the defendants apparently increased during the prosecution years, the reported profits fell to approximately one-quarter of the amount declared by the previous management in a comparable period; that the cash register tapes on which the books were based were destroyed by the defendants; and that the books did not reflect the receipt of money later withdrawn from the hotel's cash register for the personal living expenses of the defendants and for payments made for restaurant supplies. The Court found that there was ample evidence that not all the income from the hotel had been included in its books and records and that, in fact, the Government's claimed net worth increase for 1948 could have come entirely from the unreported income of the hotel and still the hotel's earnings for the year would have been only 73% of the sum reported by the previous owner for the comparable period in 1945. The necessity of showing that the unreported earnings occurred in the tax year which the charge specifies was specifically treated in Adonis, 221 F.2d 717, 721:

> "The government made a strong showing of the taxpayer's very small net worth at the end of 1947. All of his discoverable assets at the beginning of the taxable year added to his admitted earnings during that year amounted to only about 25% of what he actually spent in 1948. Thus, the inference is clear and strong that for him some source of funds was very productive in 1948. It is also relevant that appellant himself in explaining his 1948 affluence attributed it to financial transactions in that year. This is not a case of large transactions and receipts spread over a number of years. All of the evidence of large receipts and large expenditures concerns occurrences in 1948. If we are correct in our view that the evidence sufficiently indicates that appellant's 1948 expenditure included unreported income, there was ample basis for concluding that this gain was realized in that year, and no indication that it might represent acquisitions of any earlier year."

In 1949 the sum of $9,000 was deposited into the bank accounts of Bernard Kleinman as follows: from January 3 to April 26, fifteen deposits of $300 each; on April 12 and April 26, deposits of $50 each; from May 9 to November 10, twenty-two deposits of $200 each. About half of this amount was transferred to the defendant and his wife and children in the same year. The full amount was included in the Government's calculation of the defendant's net worth. Assuming the full $9,000 to have been funds originally acquired by the defendant, there appears to be no basis upon which to conclude that the funds were earned at the time they were deposited in the Bernard Kleinman accounts. It would be as reasonable to conclude that the deposits represent the systematic concealment of unreported taxable income earned by the defendant in a prior period.

The same must be said of the remaining items comprising the excess of the defendant's net worth plus expenditures, as calculated by the Government, over reported income for the year 1949: a mink cape purchased in 1949 for $900; various household appliances purchased in that year for amounts totalling $2,161.12; and approximately $2,340 in living expenses which, when the defendant's other expenses are considered, could not have been paid for out of reported income. Assuming that these items represent taxable income of the defendant, the circumstances of the instant case. are such that it cannot be said with any degree of reasonable certainty that this was income received by the defendant in the year 1949. As stated in United States v. O'Malley, supra, the requirements laid down in the Holland and Adonis decisions have not

been met, and the Government is not permitted to allocate summarily these unaccounted-for accretions to the year 1949. In United States v. Ford, supra [237 F.2d 61], there was "strong" evidence of "fabrication, misrepresentation and concealment" which, together with other factors, produced "firm ground to infer the accuracy of the Government's opening net worth figure." Since the other figures on the Government's net worth chart "were independently supported and were never challenged * * there was adequate support for a finding by the jury of unreported income during the indictment years from *some source*." It is enough to say that the evidence in the instant case has not moved the Court to this conclusion.

Here the defendant testified that he received cash from his father to pay for the cape, the appliances, and a portion of his living expenses. It is not clear from the record whether the defendant so advised the Government during the course of the investigation, nor whether inquiry was made of Bernard Kleinman during his lifetime as to the truth of these assertions. The Government's proof showed that it was both unlikely and improbable that the defendant's explanation was true. But this is short of the showing made in Adonis where "the Government by clear and convincing evidence established the complete falsity of the defendant's explanation of alleged sources of the money necessary to acquire the assets." United States v. O'Malley, supra, 131 F.Supp. 414.

It is the Court's conclusion that the case against the defendant is not clear, convincing and inconsistent with a reasonable hypothesis of innocence and that a finding of guilt should not be based upon speculation and conjecture. Cf. United States v. Riganto, D.C.E.D.Va.1954, 121 F.Supp. 158.

In view of the foregoing the Court finds the defendant not guilty of Count Two of the indictment.