**UNITED STATES of America**

v.

**Emil UCCELLINI.**

**Crim. No. 14895.**

United States District Court
W. D. Pennsylvania.

Aug. 27, 1957.

Supplemental Opinion Feb. 5, 1958.

Hubert Teitelbaum, First Asst. U. S. Atty., Pittsburgh, Pa., for the United States.

Leonard Boreman, Pittsburgh, Pa., Kalman A. Goldring, Pittsburgh, Pa., for defendant.

MARSH, District Judge.

The defendant was convicted of two counts of income tax evasion for the years 1950 and 1951 under § 145(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 145(b). Decision was reserved upon a motion for judgment of acquittal. After review of the record and exhibits, in the court's opinion the evidence was insufficient to sustain the conviction and the motion should have been granted.

The defendant was engaged in the restaurant business in Pittsburgh.

Since about 1942 he operated restaurants as an equal partner with Gilbert Kinderman who individually conducted a restaurant supply business. On March 31, 1951, defendant bought Kinderman's interest and thereafter operated the restaurant known as "Emil's" as an individual enterprise.

In 1944 the partnership purchased the building in which "Emil's" was located, and in 1943 and 1946 defendant, or defendant and his wife, bought four properties in or near Pittsburgh. One of the latter was sold prior to 1950,[1] but the defendant continued to own the others through 1951.[2]

Defendant derived income from the restaurant and rentals from some of the real estate.

Other than a check book, he kept no personal books or records of his income.

There was evidence that his expenditures in the two indictment years, after deducting allowances, depreciation and non-income items, exceeded his reported income.

For 1950 his net income, arrived at by adding expenditures and giving credit for all possible allowances, was stipulated at $8,151.57; his reported income was $6,361.40; the deficiency was $1,790.17.

■ The critical issue is whether the inference, which arose prima facie from the evidence, that the deficiency was taxable income received by defendant in 1950[3] was not overcome by the government's own proofs.

A check dated December 29, 1949, in the sum of $2,000, signed by Kinderman and drawn on the partnership bank account, payable to and endorsed by defendant, was received in evidence as defendant's Exhibit 1. Kinderman, testifying for the government, said this check probably represented defendant's share in the partnership profits paid at the end of that year. The check was negotiated to the Mt. Lebanon Federal Savings and Loan Association and paid by the bank on January 23, 1950. Defendant owed the Association money due on a mortgage, and $1,500 was credited to his account on January 19, 1950.[4] The government included this $2,000 in defendant's share of partnership income for 1949, and it vigorously argues that the jury could find that he cashed and spent the proceeds in 1949.

Defendant just as vigorously contends that this evidence demonstrates that the $2,000 was available for 1950 expenditures and, in fact, $1,500 of the proceeds was actually used to make a mortgage payment on January 19, 1950.

The circumstance on which the government relies to prove that this money was spent in 1949 is of such slight probative value as to amount to a mere scintilla in view of its proof that the check was negotiated in 1950 to a creditor of defendant. Under the government's own evidence, this $2,000 was probably available for defendant's use in 1950. If it was, defendant had sufficient money available to cover the alleged understatement of $1,790 in net income for that year. The evidence to the contrary merely made it possible that the money was spent in 1949,—it raised a mere conjecture or surmise. In the court's opinion that conjecture or surmise in the face of a contrary probability appearing in the government's case is insufficient to sustain the verdict of guilt on the first count.

It was suggested that defendant probably received in late December, 1950, a distribution of profits which he may not have spent until 1951, thus tending to counter-balance the $2,000—1949 check. This likewise is a conjecture which in absence of supporting proofs can be of no help to the prosecution.

For 1951 defendant's net income arrived at by adding expenditures, and giv-

1. Testimony, p. 287.
2. See government's Exhibits 5, 14d, 19, 25.
3. See United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546; United States v. Nunan, 2 Cir., 1956, 236

F.2d 576; Stinnett v. United States, 4 Cir., 1949, 173 F.2d 129; Gleckman v. United States, 8 Cir., 1935, 80 F.2d 394.
4. Government's Exhibit 15; Testimony, p. 57.

ing credit for all possible allowances, was $18,515.38; his reported income was $8,118.45; the deficiency was $10,396.93.

Mindful that expenditures in excess of reported income, standing alone, might not of themselves suffice to support a conviction of tax evasion [5] without evidence indicating a lack of available funds from which these expenditures might have come, the revenue agents, prior to trial, undertook an elaborate investigation in order that the government might prove, insofar as it was possible, that defendant did not have any substantial available cash, and that his 1951 expenditures, after deductions, were paid out of taxable income earned in 1951.

Accordingly, it was proved that in the preindictment years (1942–1949), defendant's private expenditures exceeded his available declared cash resources. See United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546. The agents interviewed the defendant concerning inheritances, gifts and loans. Court records were searched for inheritances and none were found.

They attempted to negative a claimed cash hoard of $15,000, allegedly saved by defendant from earnings up to 1944, by investigating his financial history back to 1926.

At the trial, December 31, 1941 was selected as a starting point. At that date defendant was credited with the alleged hoard of $15,000. During the succeeding years he was credited with depreciation and loans from his partner and certain financial institutions which were revealed by the investigation.

Defendant made no claim to the investigating agents that he received any inheritances or gifts, or that he had accumulated funds in the partnership bank account, or in his own bank account, or in a hidden place.

Disputes, which developed at the trial and discussed in the briefs, related to the accuracy of the computations; the likelihood of cash in the restaurant's cash register at the end of 1949 and 1950; [6] and the possibility of funds being accumulated in the capital account of the partnership.[7] In absence of evidence to the contrary, all these disputes could have been resolved in favor of the government.

Consequently, it is argued that the jury could conclude that defendant had not only exhausted the alleged hoard, but in addition had expended approximately $24,000 in excess of the income reported in his tax returns filed for the preindictment years, and thus there was no available cash at the beginning of the indictment years.[8] But the government's evidence tends to prove just the contrary, i. e., that defendant either had considerable cash available at the beginning of 1951, or he acquired it during the first four months of 1951 from an undisclosed source other than his partnership business and real estate rents.

The government argues, relying on Johnson, Nunan, Gleckman and Stinnett,[9] that because it had proved a prima facie case it was up to the defendant to explain [10] the 1951 deficiency of $10,396.-93 and, since he did not testify, he remained "quiet at his peril".[11] We agree with this rule, but the government's alleged prima facie case must be tested by its evidence. When thus tested, as in the first count, we think the government's own evidence destroyed its prima facie

---

5. Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192; Stinnett v. United States, 4 Cir., 1949, 173 F.2d 129; Gleckman v. United States, 8 Cir., 1935, 80 F.2d 394.

6. See Beard v. United States, 4 Cir., 1955, 222 F.2d 84, at page 89; and cf. United States v. Costello, 2 Cir., 1955, 221 F.2d 668.

7. See Schedule H attached to partnership returns of 1949 and 1950 (government's

Exhibits 27 and 28) and Schedule I attached to the partnership return of 1951 (government's Exhibit 29).

8. Testimony, pp. 248–248b.

9. See footnote 3.

10. Testimony, pp. 248a–248b; government's brief, pp. 9, 13.

11. Holland v. United States, 348 U.S. 121, at page 139, 75 S.Ct. 127, 137, 99 L.Ed. 150.

case by revealing that defendant had sufficient available funds to cover the deficiency.

Preliminarily, it is to be observed that defendant might have acquired and set aside more money than is represented by his expenditures during the preindictment years and in 1950. Of course, this statement is mere speculation, but a look at the government's evidence demonstrates that defendant had a substantial amount of available cash in March and April, 1951.

It was shown by the government that defendant bought his partner's interest in March, 1951, for $40,000; he borrowed $26,800 [12] and paid the balance of $13,200 in cash. Then defendant's bank account, introduced into evidence by the government,[13] discloses deposits, from April 1 to May 3, 1951, aggregating $10,800. Prior to April 1, 1951, his bank balances never reached $500 and were usually much less than $200; after May 3, the balances resumed their usual low level,—the $10,800 having been withdrawn in various amounts between April 1 and May 3.

Thus the government itself proved that defendant had available cash from March to May 3, 1951, totalling $24,000.

The government's proof went on to show affirmatively that the partnership was not capable of producing anything like that amount as defendant's share of profits for three months or, indeed, for any of the preceding years.[14] The efforts to show that the partnership understated its actual income failed when the partnership bookkeeper did not testify as expected, but said she entered the daily receipts in the partnership books as shown by the cash register tapes which she destroyed.[15] Subsequent impeachment testimony was expressly offered "for the protection of the government" and not as substantive evidence.[16]

These proofs disclosed that defendant's share of the 1951 partnership profits was only $490, and his other reported income was rent, which for four months would amount to about $1,373.[17]

Defendant was not shown to have had any likely source of 1951 income to account for what remained of this $24,000 available cash after deducting the $490 profits plus four months' rentals. Of course, if this money were accumulated from taxable income earned in prior years, it was not taxable in 1951. Defendant did not give any leads as to the source of this cash. It does not appear that he was even asked by the investigating agent where he got the $13,200 paid to Kinderman in March or the $10,800 deposited in his bank account in April and early May. Thus it does not appear either directly or inferentially from the government's case that this $24,000 was taxable income received in 1951. Whatever defendant earned after May 3, 1951 could not account for this cash available to him prior to that date. His reported net income for that year was $8,118.45 which exceeded his expenditures of approximately $5,500, the latter figure being the balance of his expenditures after deducting allowances and the $13,200 paid to Kinderman in March out of available cash.

All that was shown then, was a deficiency or understatement in reported 1951 income in the sum of $10,396.93, to cover which defendant was in possession of ample available cash.

The inference that excess expenditures are attributable to currently taxable income must be supported by evidence. Expenditures in excess of re-

12. $20,000 from a bank and $6,800 which defendant told the agent he borrowed from Paul Gormley.

13. Government's Exhibit 17.

14. The highest share reported by the partnership was $9,552.87 in 1948. Government's Exhibit 2.

15. The partnership owned an efficient cash register during the indictment years.

16. Testimony, pp. 192–198, 259–260.

17. See government's Exhibit 5.

ported income standing alone are not sufficient to support a conviction.[18]

The government's proof negatived the possibility that defendant's cash available from March to May 3, 1951 was earned during the first four months of 1951 from a likely source, viz., from his restaurant business and real estate rents. Nor was there evidence of wilful misrepresentations from which the jury could assume that the available cash was taxable income. See United States v. Adonis, 3 Cir., 1955, 221 F.2d 717; United States v. Ford, 2 Cir., 1956, 237 F.2d 57. Also, as stated in Adonis [221 F.2d 719], "[i]t may not be assumed merely from the government's inability to find any source of non-taxable receipts that the funds acquired during the taxable year [here from January to May 3, 1951] are taxable income."

Even if we assume defendant's available cash was taxable income, it cannot be allocated reasonably to taxable income *received from defendant's business and rents from January to May 3, 1951*.[19] The government's evidence conclusively proved that the partnership was not capable of producing income remotely approaching $24,000 for defendant's share even annually.[20] Thus the fund was either accumulated from receipts in prior years, or it was acquired in 1951 up to May 3 from an undisclosed source, and was not shown to have been taxable income. In either event, as shown, the conviction on the second count cannot be sustained.

We arrive at this conclusion reluctantly, *but trial courts have been directed* by the Supreme Court[21] to scrutinize carefully cases of similar type where a conviction is sought upon circumstantial evidence. Moreover, as was pertinently stated in Holland v. United States, 348

U.S. 121, at page 128, 75 S.Ct. 127, at page 131: "Although it may sound fair to say that the taxpayer can explain the 'bulge' in his net worth, [here expenditures in excess of reported income] he may be entirely honest and yet unable to recount his financial history. *In addition, such a rule would tend to shift the burden of proof.* Were the taxpayer compelled to come forward with evidence, he might risk lending support to the Government's case by showing loose business methods or losing the jury through his apparent evasiveness * * * [T]he courts must minimize this danger." (Emphasis supplied).

Seemingly appropriate is this admonishment to this case if the taxpayer here were compelled to state when or from where he accumulated the $24,000 which he had available from March to May 3, 1951, to say nothing of his expenditures in excess of declared income during the preindictment years.

We agree with the government that it was entitled to go to the jury on a prima facie case under the authority of Johnson, Gleckman and Stinnett. But when that case is destroyed by the impact of its own evidence, i. e., that defendant had cash available sufficient to cover expenditures in excess of income, which cash was not derived from his known sources of current taxable income, it cannot shift the burden of proof to the defendant under the Supreme Court's protective rule.

An order for judgment of acquittal will be entered.

### Supplemental Opinion.

MARSH, District Judge.

Following the entry of judgment of acquittal, the government moved to vacate said judgment and reinstate the jury's verdict of guilty. The defendant opposes

---

18. See cases cited in footnote 3.

19. See Holland v. United States, 348 U.S. 121, at page 129, 75 S.Ct. 127, at page 132, par. 6.

20. See footnote 14.

21. Holland v. United States, 348 U.S. 121, at page 129, 75 S.Ct. 127, at page 129; Smith v. United States, 348 U.S. 147, at page 159, 75 S.Ct. 194, 99 L.Ed. 192.

this motion and argues that the court does not have jurisdiction to vacate its judgment of acquittal and reinstate the guilty verdict. Counsel have not referred to any precedent precisely deciding this interesting question, and it is unnecessary to decide it in the case at bar because the court has not been persuaded that the judgment of acquittal was erroneously entered.

Counsel for the government complains that the decision tends to upset that which he characterizes as "the classical methods of proof" in tax evasion cases when direct evidence is not available. With respect to this complaint, it is sufficient to state that there was no disposition or intention to do so; the essence of the court's decision is that the facts established by the government itself destroyed the inferences normally to be drawn from the indirect methods of proof used in this case.

The government continues to urge that the jury could infer from its proofs that defendant's expenditures in excess of his reported income in the indictment years were taxable income because the defendant had a "lucrative" business as a partner in a restaurant. However, that business was not shown to be lucrative in the sense that it was capable of producing the cash proved by the government to have been available to the defendant in the indictment years. On the contrary, direct evidence introduced by the government tended to prove that the partnership income did not account for defendant's expenditures in excess of reported income during pre-indictment years, and likewise tended to prove that the partnership income during the indictment years 1950 and 1951 did not account for his excessive expenditures to say nothing of the $24,000 defendant had available in cash during the first four months of 1951. The partnership kept books of account, and no fraud or evasion by the partnership was proved.

In addition to the foregoing failure of proof, no likely source of income was shown in the indictment years which would justify an inference that defendant's excessive expenditures and available cash in those years stemmed from unreported current receipts.[1]

The government concedes in its brief that "there must be some additional evidence from which an inference arises that the moneys spent represents taxable income derived in the indictment year or years".[2] To supply this evidence, it again strenuously urges that under the Adonis case [3] and the Ford case,[4] the defendant's alleged fabrication could be sufficient proof that those funds were derived from current taxable sources.

The Adonis and Ford cases were net worth cases. In that type of case inference of evasion arises from equating a "bulge" in the net worth during the indictment year with unreported current receipts, plus enough proof to negative the possibility that those unreported current receipts were non-taxable. In both cited cases it was sufficiently, if not conclusively, established by the government that the defendants *received considerable money during the indictment years* from *some* source which had not been reported. Willful fabrications by Adonis and Ford pertaining *to the sources of these unreported current receipts* were held to be sufficient evidence to negative a nontaxable source or, as in Adonis, for the jury to infer that current receipts were in fact taxable income.

The case at bar was not of the net worth variety, and the government's proof was insufficient for the jury to infer that the money representing defendant's available cash and excess ex-

---

1. See observations of Judge Hincks in United States v. Ford, 2 Cir., 1956, 237 F.2d 57, 64–65.

2. Government's brief sur motion to vacate judgment of acquittal, p. 2.

3. United States v. Adonis, 3 Cir., 1955, 221 F.2d 717.

4. United States v. Ford, supra f.n. 1.

penditures during each indictment year was derived from *unreported current receipts*. In fact, as pointed out above, the probability, established by the government's proof, was that in the indictment years that money was not derived from current restaurant receipts, and no likely source was shown therefor. Moreover, the defendant made no false representations as to the source of that money from which the jury might infer that it was taxable income. He was not even questioned concerning the same.

The fabrication which the government contends it proved referred to $15,000 which the defendant claimed to have accumulated long prior to the indictment years, viz., between 1926 and 1944. Whether or not the jury found this accumulation to have been a fabrication cannot be determined from its verdict because the government itself assumed the truth of that accumulation in presenting its case to the jury. It would be speculative now to presume that the jury did not accept the government's own assumption in that regard. In any event, the government proved defendant spent the 1944 hoard and more prior to January 1, 1950; in view of this evidence the alleged fabrication was not referable to the source of the money spent and available in the indictment years. In fact the defendant never made any such claim.

Without doubt, this case presents some unusual and difficult problems of analysis, involving as it does a partnership, the status of whose bank accounts, if any, capital structure, and capital accounts of each partner were not disclosed, and where the defendant's net worth at the beginning and end of each indictment year was not proved. The court's decision for acquittal, of course, is not free from doubt, but the doubt which we entertain as to the sufficiency of the evidence preponderates in our opinion so much against conviction that the motion to vacate should be denied.