**UNITED STATES of America**

v.

**William GOICHMAN.**

**Crim. No. 74–515.**

United States District Court, E. D. Pennsylvania.

Jan. 20, 1976.

Robert E. J. Curran, U. S. Atty. and Gilbert J. Scutti, and William A. DeStephano, Asst. U. S. Attys., Philadelphia, Pa., for the United States.

Robert F. Simone, Philadelphia, Pa., for defendant.

## OPINION

CLARY, Senior District Judge.

This is a net worth prosecution under 26 U.S.C. § 7201 for willful attempt to evade or defeat payment of income tax. The defendant, William A. Goichman, a cash basis taxpayer, is an attorney who formerly practiced law in Philadelphia. He now resides in Beverly Hills, California.

On September 10, 1974, the grand jury handed up a two-count indictment charging the defendant with attempting to evade payment of income taxes in the taxable years 1968 and 1969. The case was transferred to my calendar by the Honorable Clifford Scott Green of this District on May 14, 1975. The case was specially listed for trial on June 16, 1975. On June 26, 1975, the jury returned a verdict of guilty on both counts. The defendant filed post-trial motions for judgment of acquittal and for a new trial. On October 29, 1975, I heard oral argument on the motions. For the reasons which follow, the motions are denied.

### I.

To sustain a conviction under § 7201, the Government must prove three elements: the existence of a tax deficiency, willfulness, and some affirmative act constituting an evasion or an attempted evasion of income taxes. *Sansone v. United States*, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965), *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

In this case, the Government used the "net worth method" to prove the exist-

ence of a tax deficiency. This procedure was approved by the Supreme Court in *Holland v. United States, supra.*

■ In a net worth case, the Government first attempts to establish an "opening net worth"—the total value of all the taxpayer's assets for the last year preceding the years under prosecution. In this case that year was 1967. The government then proves increases in the taxpayer's net worth at the end of each of the prosecution years. Here, those years were 1968 and 1969. The Government then adds nondeductible living expenditures. If the resulting figure is substantially greater than the taxable income reported by the taxpayer for any one of the prosecution years, the Government claims the excess is taxable income which was not reported. *Holland, supra,* 348 U.S. at 125, 75 S.Ct. 127, *United States v. Massei,* 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517 (1958).

■ The Government has the burden of proving the opening net worth figure with "reasonable certainty." *Holland, supra,* 348 U.S. at 132, 75 S.Ct. 127. In this case, the Government used a source and application of funds analysis to show the amount of money available to the defendant from 1956, the year he graduated from law school, to 1967. The Government next computed the defendant's net worth by adding the total value of all assets owned by him on December 31, 1967. Because of the great disparity between the defendant's actual net worth on that date, and the total funds available to him as calculated by the Government agent he was credited with no cash on hand for the net worth computation.

The Government next showed increases in net worth in the years 1968 and 1969. These increases were primarily in three classes of assets: stocks, bank accounts, and real estate investments. According to the Government, the defendant's net worth increased about $50,000 in 1968 and about $75,000 in 1969. These increases exceeded by a substantial margin the taxable income the defendant reported in those years.

■ Having shown net worth increases in excess of reported taxable income, the Government must either negate all possible non-taxable sources of income to explain the increases, or it must prove a likely source of taxable income which was not reported. The Government need not prove both. *United States v. Massei,* 355 U.S. 595, 78 S.Ct. 495 (1958), *United States v. Calles,* 482 F.2d 1155, 1159 (5th Cir. 1973). In this case, the Government showed a likely source, the defendant's law practice, but it also introduced extensive evidence tending to negate the possibility of non-taxable sources.

■ Where the case rests on circumstantial evidence, as this one does, the Government must also investigate any leads furnished by the defendant, but in the absence of leads it need not negate every hypothetical explanation for the bulge in net worth. *Holland v. United States, supra,* 348 U.S. at 138, 78 S.Ct. 127; *United States v. Procario,* 356 F.2d 614, 617 (2d Cir. 1966), *cert. denied,* 384 U.S. 1002, 86 S.Ct. 1923, 16 L.Ed.2d 1015 (1966).

■ "Willfulness" in the tax offenses set forth in 26 U.S.C. §§ 7201–7207 refers to a bad purpose or evil motive to do the thing which the law forbids. Negligence, even gross negligence, is not sufficient to establish willfulness for purposes of these statutes. This bad purpose of evading payment of income tax can be shown by the deliberate filing of false returns which the defendant knew did not accurately reflect his taxable income. *United States v. Bishop,* 412 U.S. 346, 359–61, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973); *Holland v. United States, supra,* 348 U.S. at 139, 78 S.Ct. 127; *Spies v. United States,* 317 U.S. 492, 498–99, 63 S.Ct. 364, 87 L.Ed. 418 (1943); *United States v. Vitiello,* 363 F.2d 240, 242 (3rd Cir. 1966); *United States v. Greenlee,* 517 F.2d 899, 904 (3rd Cir. 1975). Here, the evidence showed a pattern of diverting settlement checks the defendant received in his law practice in such a way that they did not come to the attention of the accountant

who prepared the defendant's tax returns. There was other circumstantial evidence including, of course, the defendant's background and education. *See, United States v. Rischard*, 471 F.2d 105, 108 (8th Cir. 1973).

 The Government has the burden of proving every element of the offense, though not to a mathematical certainty. However, once the Government shows that the defendant's net worth increased substantially more than the taxable income he reported and that the defendant's way of doing business permitted the non-disclosure of income, and where the defendant supplied the Government with no leads to a source of non-taxable funds to explain these increases, and where the increases themselves had every appearance of coming from taxable income, the defendant remains quiet at his peril. *Holland v. United States, supra*, 348 U.S. at 138–39, 78 S.Ct. 127, *United States v. Slutsky*, 487 F.2d 832, 842 (2d Cir. 1973), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287, reh. denied, 416 U.S. 1000, 94 S.Ct. 2414, 40 L.Ed.2d 777 (1974).

With these considerations in mind, I now pass to the evidence adduced at trial.

## II.

The evidence upon which the jury could have based a verdict of guilty was as follows:

The Government credited the defendant with an opening net worth on December 31, 1967, of $173,643.52. The net worth figure represented the total of cash in banks, business assets, stocks on hand, and the purchase price of his residence which was fully paid for, less liabilities. This figure, when added to accumulated depreciation, exceeded the actual funds available as of December 31, 1967 by more than $15,000.00. The actual funds figure was based on an exhaustive analysis of the defendant's financial history from 1956, the year he graduated from law school, to the end of 1967, the last pre-prosecution year.

To arrive at the actual funds figure, the defendant was credited with having $10,000 in 1956, the starting point of the Government's calculations. This was based on sworn testimony by the defendant in a support proceeding in Common Pleas Court in Montgomery County in 1970, in which he stated that he did not think his assets exceeded $10,000 at that time. The $10,000 starting point figure was corroborated by the fact that the defendant graduated from law school in 1955, that he and his wife lived in an apartment for a year after their marriage in 1957 and by the fact that when they first purchased a home in 1958, they paid $11,400 and placed about $1,000 down.

It was further corroborated by defendant's testimony in Montgomery County that he received no gifts exceeding $1,000 in wedding gifts, that he inherited no money, and that he does not gamble.

He was next credited with a total adjusted gross income for the years 1956 to 1959 of $30,746.60. This figure represents four times $7,687.40, which was the adjusted gross reported by the defendant in 1960. No tax returns were available for the years preceding 1960. The figure was based on the defendant's testimony in Montgomery County that his income gradually rose over the years with no significant jumps. This was corroborated by certificates of assessment containing code numbers which indicated joint returns were filed by the Goichmans showing an adjusted gross income of less than $10,000, by an application for employment with the Pennsylvania Public Utilities Commission dated October 24, 1957, showing a salary of $4,500 a year as a law clerk, P.U.C. pay records showing defendant's salary was $7,173.50 in 1958 and $7,168.00 in 1959, by Pennsylvania mercantile license tax records for defendant's law firm dated May 26, 1959, indicating gross receipts of $2,603.00 and Philadelphia net profits tax records showing that no return was filed for the firm in 1958 and that on June 1, 1960, a return was filed which indicated a net profit of $7,788.00.

(The defendant's first legal position was law clerk to Judge Sporkon of the Common Pleas Court. While serving in this capacity, he was also an associate of Max Deroff. In 1958, he went into partnership with Martin Krimsky. The Philadelphia tax records relate to the firm of Krimsky and Goichman. The City was unable to locate any records relating to this firm other than the ones introduced into evidence. In November 1957, the defendant was hired as an Assistant Attorney General assigned to the Public Utilities Commission. In 1963, the defendant dissolved his partnership and he became a sole practitioner from that date forward.)

Finally, the adjusted gross income as reported on the defendant's Form 1040 joint tax returns for the years 1960 to 1967, totalled $183,681.25. The 1964 joint return showed that Beverly Goichman realized $883.50 in income from a business partnership.

To these figures were added depreciation, dividend exclusions, and 50% excess capital gain, as reported on the 1960 to 1967 returns. From the gross figure were deducted itemized deductions, Federal taxes paid and other expenditures per the 1960 to 1967 returns. The actual funds available was calculated to be $157,419.52 as of December 31, 1967. As we have seen, this figure was exceeded by the defendant's net worth as of that date by more than $15,000. Accordingly, for the defendant to have $1.00 cash in hand not accounted for by the Government's analysis, he would have to have at least $15,000 as well.

An alternative actual funds analysis used 1963 as a starting point. This was based on a mortgage application for purchase of a property located in Abington Township, Montgomery County which listed assets including $15,000 in cash and $4,500 in stocks and other investments. This computation yielded an actual net funds available figure as of December 31, 1967, of $145,128.67. The negative cash position of the defendant using this analysis is, therefore, even larger.

In making the net worth calculation, the Government included numerous bank accounts maintained by the defendant, and his wife either in their own names or in trust for their children. The total figure at the end of 1967 was $72,863.01. The full amount was charged to the defendant, based on testimony in the Montgomery County support proceeding that he supplied all the funds for such accounts and that his wife never worked, on a complaint in equity also filed in Montgomery County in 1969, in which the defendant again claimed that he supplied all funds for such accounts, and on a "history of children's assets" in which the defendant in the support proceeding claimed to have purchased a number of certificates in the children's name. This "history" was a certified and exemplified exhibit from the support proceeding.

The Government also charged the defendant with the full cost value of stocks on hand of $50,357.36. A number of these accounts were in the name of Beverly Goichman. The basis for charging the full value of these holdings to the defendant was his testimony in the support proceeding, the complaint in equity in which he claimed to have provided funds for numerous specific stocks and mutual funds in his wife's name, and a series of letters to Goodbody & Co. on the defendant's stationery transferring funds and stock to two accounts in Beverly Goichman's name.

The next step in the Government's case was to show an increase in net worth in the prosecution years. In 1968, the defendant's net worth (assets less liabilities) increased to $219,208.37. In 1969, it increased to $294,047.20. The cash in banks total increased from $72,-863.01 in 1967 to $85,257.07 in 1968 and to $99,659.73 in 1969. The cash in banks figure included $18,869.85 in a Western Savings Fund Society account opened in 1969. There was testimony that this account may have been, at least in part, an escrow account for holding client's funds at interest.

The stock holdings increased from $50,357.36 in 1967 to $64,012.72 in 1968

and to $68,504.39 in 1969. Although many of these stock holdings were in Beverly Goichman's name, the defendant repeatedly claimed in Montgomery County proceedings to have supplied all the funds for these assets.

There was a small increase in non-cash business assets.

The heart of the government's case, however, was a series of real estate partnership investments in 1968 and 1969. The value of these investments grew from zero in 1967 to $24,192.00 in 1968 and to $84,313.00 in 1969. These figures represented capital account balances from a total initial investment in four partnerships of $100,000 in the prosecution years. These investments are shown on four Form 1065 Partnership returns filed in 1968 and 1969 on which the defendant is listed as a partner. The first was Peoria Towers Associates, formed on October 4, 1968. The second was Allegheny Industrial Associates, formed on January 31, 1969. The third was Triester Riviera Oaks Associates, formed on July 17, 1969. The last was Triester Coach and Four Associates, formed on September 4, 1969. The defendant invested $25,000 in each of these partnerships. These investments are in the defendant's name alone, and in the support proceeding, he testified that his wife had nothing to do with them.

The total increase in the defendant's net worth in 1968 was $53,743.82. In 1969 it increased again by $74,838.83. In 1968, the defendant reported taxable income of $27,791.17. In 1969, he reported taxable income of $17,895.70.

The Government's expert next attempted to show what his true income must have been and what the tax liability would be. To the increases in net worth for each prosecution year were added adjustments to reflect itemized deductions claimed in those years, federal tax payments, gifts to the children, and, for 1969 only, a list of other personal living expenses enumerated in a list of family expenditures for that year in an exhibit from the Montgomery County proceedings. Deductions were made for capital gain and dividend exclusions and for cash available shown on the children's returns. The adjustments totalled $32,356.75 for 1968 and $30,120.58 for 1969.

The adjustments to net worth did not attempt to reflect other evidence in the case, again from the defendant's testimony in the support proceeding, regarding the defendant's life-style during this period. This evidence indicated that he owned several cars, including a Cadillac, that he and his wife made several trips to places like Acapulco, Jamaica, London and Aruba, that he employed a full-time maid for several years, and that he purchased a number of expensive gifts for his wife.

These figures yield an adjusted gross income of $86,100.57 in 1968 and $104,956.41 in 1969. After allowing for itemized deductions and personal exemptions, the taxable income that emerges is $77,300.51 in 1968 and $95,573.81 in 1969. The tax liability on these taxable incomes was $33,971.72 in 1968 (instead of $7,504.95 reported by the defendant) and $46,595.81 in 1969 (instead of $4,169.87 as reported). The tax liability was calculated from the tax tables for joint returns and includes the tax surcharge applicable in the years 1968 and 1969. The alternate tax computation yields slightly different results.

The Government next showed that the defendant had a source of income which could have provided funds for these investments without being reported on his tax returns. That source was his law practice.

The witness Michaels, a C.P.A. who prepared the defendant's tax returns in the years 1966 to 1970, described the method used by the defendant and himself to compute the defendant's taxable income. He said the defendant maintained two accounts at Philadelphia National Bank. One was an escrow account; one was a personal account. The defendant was supposed to deposit all funds received in his law practice into

the escrow account. When any item became income to the defendant, the fee would be transferred from the escrow account to the personal account. Michaels would then compute the defendant's income by comparing the two bank statements at the end of the year.

If an item of income did not reach these accounts, it would escape Michaels' attention and would not be included as income on the tax return. Michaels testified he did include the defendant's salary from the Pennsylvania Utilities Commission, but he stated the defendant never gave him any indication he received income from his private practice other than the items listed in the bank statements. He stated he was not aware of the existence of the WSFS "escrow" account.

The defendant's testimony in the support proceeding corroborated this method of accounting, but he stated there that he sometimes received cash fees and he sometimes cashed settlement checks for clients. He maintained, however, that he supplied his accountant with these cash figures orally.

The government produced three former clients of the defendant, the witnesses Flaxman, Keilman and Schleinkofer. Each identified settlement checks from insurance companies dated in 1967. The witness Tanitsky, a claims manager with American Mutual Liability Insurance Company, identified two additional settlement checks payable to a Helen Gladfelter in 1967. Flaxman, Keilman and Schleinkofer testified that after endorsing their checks, the defendant paid them their share of the settlement in cash or by issuing another check. All five of these checks have the statement on the back "pay to the order of Goodbody and Company."

The government also produced two letters on the defendant's stationery addressed to Goodbody and Company. These letters, dated September 28, 1967, and January 2, 1969, list a number of checks which were enclosed in payment of bills for the purchase of securities.

The letters state that the Flaxman, Keilman, Schleinkofer and Gladfelter checks are enclosed.

At the support proceeding, the defendant also outlined the method by which he raised money for the $100,000 in real estate partnership investments. He said he would pledge savings certificates and then pay off the loans out of income when it was earned. He said "to some extent" he paid off the loans the same way he paid for the stocks—with endorsed settlement checks. (N.T. 4–76)

Finally, the government produced notes representing loans totalling $90,000 made to the defendant by First Federal Savings and Loan Association in the prosecution years.

The first of these notes for $25,000 is dated September 11, 1968, less than one month before the formation of Peoria Towers Associates in which the defendant invested $25,000. This note was paid off by November 20, 1968. The payment slips show it was paid in part by checks in the amounts of $325.00, $2500.00, $1,000.00, $10,382.80, $600.00, $1500.00, $1700.00, and $1,800.00.

The second of these notes, in the amount of $15,000 is dated January 6, 1969, less than one month before the formation of Allegheny Industrial Associates in which the defendant invested $25,000. This note was paid off by January 28, 1969, with payments of $15,000 and $5.69.

The third note, for $25,000, is dated June 2, 1969, about a month-and-a-half before the formation of Triester Riviera Oaks Associates in which the defendant invested $25,000. This note was paid off by August 15, 1969. The payment slips indicate payment by checks in the amounts of $3,900.00, $1,989.00, $400.00, $1,200.00, $500.00, $500.00, $13,000.05 and $10,000. The amounts credited as payments on three occasions are $10,000, $8,000 and $7,127.03. The total amount of the checks exceeded the amount of the payment made by $5,873.02 on one occasion and by $489.00 on another occasion.

The last note, for $25,000, is dated August 14, 1969, less than one month before the formation of Triester Coach and Four Associates in which the defendant invested $25,000. This note was paid off by September 8, 1969. The payment slips indicate payments by checks of $10,124.15, $9,002.83, $35.17 and $5,873.02. The government also introduced a copy of a check for $10,124.15 dated September 2, 1969, drawn on the Western Savings Fund account the defendant claimed was an escrow account. It was made payable to First Federal Savings and Loan. The $10,124.15 payment on this last note was made on September 5, 1969.

As an alternative theory for the source of the $100,000 invested in 1968 and 1969, defense counsel read in a portion of the transcript from the support proceeding in which the defendant stated his tax returns for those years did not accurately reflect the amount of cash he had available because the business expenses he deducted "may have been exaggerated." (N.T. 4-65).

In response, the prosecutor had the following question and answer from the same transcript read to the jury:

Q. But either they are exaggerated, in which case you had a lot more cash, or if they are not exaggerated, then it's a fair question as to where you got the hundred thousand dollars from. Isn't it?

A. That's a possible theory. It could have been exaggerated. There might have been more money there. Maybe there was cash I didn't report. Maybe there was transactions that I haven't presented to the Court which grew out of other transactions. There may be—yes, there are maybes. (N.T. 4-71).

The defendant put on no evidence at all, except that which came in as a result of cross-examination.

■■■ The evidence at this state must be viewed in the light most favorable to the Government. *Glasser v.* *United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Moreover, questions of the weight of the evidence or the credibility of any of the witnesses are foreclosed by the verdict of the jury. *United States v. Greenlee, supra,* 517 F.2d at 903. Viewed in this light, there was substantial evidence from which the jury could have found beyond a reasonable doubt that the defendant willfully attempted to evade payment of the tax that was due on his true taxable income in 1968 and 1969, and that the amount of tax deficiency was substantial. The jury could have found that he did this by failing to report substantial amounts of income in the form of settlement checks which he used to pay for his investments. The jury could also have inferred, from the admission by the defendant that his business deductions "may have been exaggerated," that he attempted to evade his taxes by falsifying both ends of his returns—by overstating his business expenses and understating his gross income.

### III.

The defendant has submitted a lengthy, incoherent brief raising almost a score of points and citing numerous inapposite cases in support of his post-trial motions. Some of these arguments are repeated at several different places. However, at no point does he directly confront the core of the Government's case—the source of the $100,000 he invested in real estate partnerships in the prosecution years.

At oral argument on the motions, defense counsel confined himself to a few major points aimed primarily at the Government's opening net worth figure, at the element of willfulness, and at allegedly prejudicial comments by the prosecutor and the trial judge. I will consider the defendant's contentions *seriatim.*

### A. *Admissibility of Evidence*

The defendant challenges the admissibility of the complaint in equity in the case of *William A. Goichman v. Beverly*

*Goichman,* Common Pleas Court, May Term, 1969, in Montgomery County (G–39); exhibits from the support proceeding, *Beverly Goichman v. William A. Goichman,* Common Pleas Court, November Term, 1969, in Montgomery County; the evidence relating to the diversion of settlement checks; the Philadelphia tax records (G–23, A, B, C); The Goodbody records (G–34 A, B, C, D, E, F), the 1963 mortgage application (G–26 A), and the proof of repayment of loans made to purchase the real estate interests (G–71 A, B; G–72 A, B, C; G–73 A, B, C; G–74 A, B, C).

### 1. *The Complaint in Equity:*

■ The defendant argues that it was prejudicial to admit the complaint without also requiring the Government to introduce the answer. This argument is not easy to understand. The complaint is an admission sworn to under oath by the defendant. The answer was certainly as available to the defendant as to the Government, and if it contained material beneficial to his case, he could have introduced it. The Government is not required to present both the prosecution and the defense. But the whole issue is irrelevant anyway because any allegation of ownership Beverly Goichman may have made does not change the fact that the defendant claimed to have supplied the funds for the assets in controversy in that proceeding. The defendant is charged with evading income taxes, after all, not a personal property tax.

### 2. *The Exhibits From The Support Case:*

■ The defendant complains that the tax returns for 1961 and 1962 are incomplete in that they lack a Schedule C, and that the "history of children's assets" is not shown to have been introduced by the defendant in that case. These exhibits are all certified and exemplified copies of exhibits introduced in the support proceeding. The tax returns for 1961 and 1962 show on the front page that no Schedule C was filed in those years. The history of children's assets bears a defense exhibit number, and it refers to the defendant's wife and children. Finally, the information contained in the exhibits is verified by the complaint in equity and by the bank and stock broker records.

### 3. *Diversion of Settlement Checks:*

This evidence consists of copies of five checks, copies of two letters to Goodbody and Company on the defendant's stationery purporting to enclose those checks in payment of the defendant's account, and testimony by the defendant's accountant as to how the defendant's income tax returns were prepared. Since these records relate to 1967, the argument is that the defendant is prejudiced by evidence which tends to show underreporting in 1967, a year barred from prosecution by the statute of limitations. He argues further that the evidence has slight probative value because there was no evidence to diversion of checks in 1967 to similar conduct in the prosecution years.

■ Evidence of this kind is relevant and admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rule 404(b), Federal Rules of Evidence. *See also United States v. Stirone,* 262 F.2d 571, 576 (3rd Cir. 1958), rev'd on other grounds, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); *United States v. Hines,* 470 F.2d 225, 227–28 (3rd Cir. 1972), *cert. denied,* 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973); *United States v. Parenti,* 326 F.Supp. 717 (E.D.Pa.1971), *aff'd* 470 F.2d 1175 (3rd Cir. 1972), *cert. denied,* 411 U.S. 965, 93 S.Ct. 2145, 36 L.Ed.2d 686 (1973). This evidence was admitted for the limited purpose of showing opportunity or method of generating unreported income. The jury was so cautioned. (N.T. 8–30, 31).

The evidence *was* connected to the prosecution years through the payment slips attached to the notes evidencing loans made to the defendant from First Federal to raise $90,000 of the $100,000

he invested in real estate in the prosecution years, and through the testimony from the support case.

### 4. *The Philadelphia Tax Records:*

██ The defendant complains these are. inconsistent in showing gross earnings of $2,000 and net profits of more than $7,000. These were actually two sets of records for two different years. In any case, they were only offered in corroboration of admissions and other evidence that the defendant's gross income in the years 1958 and 1959 was less than $10,000.

### 5. *The Goodbody Records:*

██ The defendant objects that the custodian who presented these records is an employee of Merrill, Lynch, Pierce, Fenner and Smith and was not employed by Goodbody. The witness, however, was the section manager in charge of the liquidation of Goodbody and Company, he spent several weeks with Goodbody in 1970 as a consultant, Merrill, Lynch became the owner of all Goodbody records through a subsidiary, and the witness worked with these records on an everyday basis. Finally, I took judicial notice of Securities and Exchange Commission NASD and New York Stock Exchange bookkeeping regulations covering the securities industry. (N.T. 3–75).

### 6. *The Proof of Loan Repayment:*

██ Finally, the defendant complains that the proof of repayment of the $90,000 in loans to purchase real estate prejudiced him because he was not given these exhibits in advance of trial. This argument is entirely specious. The first evidence of the existence of the loans was introduced by defense counsel on cross-examination of one of the Government's experts. The Government had no leads to these loans because, although the defendant testified in the support case that he raised the capital for his real estate investments by pledging certificates of deposit, he also testified that he owed no money—as indeed the repay-

ment slips show he did not. Moreover, no interest was reported on his 1968 and 1969 tax returns. In practical effect, the loans were rebuttal evidence. At the trial, it was the Government, not the defendant, that was taken by surprise. If the Government had not been able to prove that each of the loans had been repaid in a year of borrowing, the case may well have been a proper one for dismissal. Under the circumstances, the defendant's claim of prejudice is preposterous.

### B. *Opening Net Worth*

The defendant attacks the Government's opening net worth figure at four points: the starting point net worth figure of $10,000 in 1955; the zero cash-on-hand figure in 1967; the failure to do a full, separate net worth analysis of the defendant's wife and children; and the failure to include in any of the net worth analyses such property as household furnishings and cash surrender value of insurance policies.

### 1. *The Starting Point:*

The principal basis for the $10,000 starting point figure is the defendant's admission in the support proceeding that his assets on graduation from law school probably did not exceed that amount. The defendant argues the testimony is vague and uncorroborated.

██ The general rule in net worth cases is that extrajudicial admissions must be corroborated. *Smith v. United States,* 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954); *United States v. Calderon,* 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202 (1954). In each of those cases, however, the admissions were made to Internal Revenue Service agents in the course of their investigation. In *Smith,* the Court indicated that admissions made under other circumstances, providing grounds for the inference of reliability, may not have to be corroborated. *Smith v. United States,* 348 U.S. at 155, note 3, 75 S.Ct. 194. In *Cleveland v. United States,* 477 F.2d 310 (7th Cir.

1973), the Seventh Circuit held that admissions from in a divorce proceeding which were read to the jury in the tax evasion prosecution need not be corroborated. *Cleveland v. United States,* 477 F.2d at 313–14.

It is not necessary to rely on the holding in *Cleveland* in this case, however, for the Government did present corroboration. Admissions may be corroborated in two ways: (1) by separate evidence tending to demonstrate the truth of the specific fact admitted, or (2) by evidence tending independently to show evasion was attempted and the defendant was responsible. *United States v. Mathews,* 335 F.Supp. 157, 162 (W.D.Pa.1971), appeal dismissed, 462 F.2d 182, *cert. denied,* 409 U.S. 896, 93 S.Ct. 123, 34 L.Ed.2d 153 (1972). As to the first type, the Supreme Court in *Smith* held that the separate evidence is sufficiently corroborative if it bolsters the admission and thereby proves the offense through the statements of the defendant. 348 U.S. at 156, 75 S.Ct. 194.

■ Here there was independent evidence that the defendant graduated from law school in 1955, that he and his wife lived in an apartment until 1957, that when they purchased a home in 1958 they paid $11,400, placing 10% down. This closely tracks the corroboration deemed sufficient in *Smith* which consisted of that defendant's employment as a clerk at $40 a week, and the purchase of a home for $9,600, placing less than one third down. 348 U.S. at 157–58, 75 S.Ct. 194.

The defendant argues that this corroboration is derived from the same source as the $10,000 figure, the testimony in the support case. The short answer to this is that it is not true. The purchase price of the home is shown on the face of the deed. The figure also is bolstered by the application for a mortgage in 1963 which lists assets consisting of $15,000 cash in banks and $4,500 in stocks. Further corroboration is found in the two source and application of funds analyses, the one based on the $10,000 figure of 1955, the other based on the application of 1963. Both analyses produced substantial negative cash positions by the end of 1967. The Government had no leads to any cash hoard in 1955 sufficient to account for both the negative cash position and the $100,000 invested in real estate in the prosecution years. No evidence of such a hoard was produced at trial. In fact, looking at the evidence as a whole, $10,000 is a rather generous estimate of the net worth a law student could acquire before graduation.

■ In light of the corroboration that was offered, it likewise cannot be maintained that the admission is impermissibly vague. The testimony itself identifies assets as including a car, some bank accounts and some stocks. This shows familiarity with his own financial affairs, an area clearly not outside the defendant's competence. The weight to be given the admissions was for the jury. Similarly, it was for the jury to give whatever consideration it wished to defendant's cash hoard argument for 1955. Where there was no evidence of a substantial cash hoard as of that date, let alone evidence that it was still on hand as of the end of 1967, the jury was certainly entitled to reject the argument. *McGarry v. United States,* 388 F.2d 862, 868 (1st Cir. 1967), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455 (1969).

### 2. *The Zero Cash Figure:*

The Government, as we have seen, credited the defendant with no cash on hand in the opening net worth figure for the end of 1967. While the defendant in his brief does not clearly distinguish between the starting point figure and the opening net worth figure, appears to argue that the Government's own evidence shows that he had cash. He points to settlement checks cashed in 1967 totalling some $10,000, purchases of stock and bank deposits in 1968, and evidence (though somewhat cryptic) of a safe deposit box.

■ The Government's source and application of funds analysis produced an actual funds figure as of the end of 1967

of $157,419.52. The net worth figure however, was $173,643.52. Therefore, the analysis produced a negative cash figure of more than $15,000. In other words, before the defendant could have had one dollar to invest in real estate from a cash hoard, he would have to have at least $15,000 to overcome the negative cash figure indicated by the net worth analysis. If the defendant made other purchases and investments, this only increases the amount of cash needed before one dollar could be invested in real estate. In fact, the Government's evidence showed increases in the value of stocks and bank accounts totalling more than $25,000 in 1968. For the defendant to have made these investments as well as the $25,000 real estate investment in 1968 from a cash hoard and not from income he would have required more than $65,000 in cash, just to explain his investments in 1968. Even these figures do not reflect expenditures for the defendant's rather extravagant life-style during this period.

Even if the evidence clearly showed that there was cash on hand, it was for the jury to determine if there was enough to account for the sizable increases in net worth in the prosecution years. *Vloutis v. United States,* 219 F.2d 782, 793 (5th Cir. 1955). In a case such as this where the Government conducted a thorough investigation and still failed to find any cash, and the defendant failed to offer any off-setting evidence of cash, the jury could certainly have concluded there was no cash to find. *Fowler v. United States,* 352 F.2d 100, 107 (8th Cir. 1965), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966); *United States v. Mackey,* 345 F.2d 499, 506 (7th Cir. 1965) *cert. denied,* 382 U.S. 824, 86 S.Ct. 54, 15 L.Ed.2d 69 (1965).

Contrary to the situation in *Dupree v. United States,* 218 F.2d 781, 785–87 (9th Cir. 1955), in which the Government ignored funds claimed to be available by the defendant, and *United States v. Uccellini,* 159 F.Supp. 491–495 (W.D. Pa.1957), in which the Government's own

case negated the defendant's business as a likely source, the Government here did take into account non-taxable sources in reaching the zero cash figure. The defendant testified in the support case that he had not received gifts in excess of $1,000, that he did not gamble and that he did not inherit any money. As to the safe deposit box, the Government had no lead from the defendant that it existed. In the absence of leads, the Government is not required to negate every conceivable source of non-taxable income, a matter that is particularly within the knowledge of the defendant, when it does show a likely taxable source. *Holland v. United States, supra,* 348 U.S. at 138, 75 S.Ct. 127.

The defendant complains that the defendant's testimony in the support case that he received no gifts in excess of $1,000 is capable of two interpretations. It could mean he received many gifts but none larger than $1,000, or it could mean that the aggregate value of all gifts not more than $1,000. Conceding this to be the case, this is an argument for the jury. Presumably, the jury considered it and resolved the ambiguity against the defendant.

### 3. *Net Worth of the Wife and Children:*

Had the Government failed to make any net worth investigation of the wife and children, that failure may well have been fatal to the case. *United States v. Merriwether,* 440 F.2d 753, 756 (5th Cir. 1971); *United States v. O'Malley,* 131 F.Supp. 409, 411 (E.D.Pa.1955). However, the wife's and children's assets were studied. It is true that numerous bank accounts and securities holdings were in their names, but ownership of those assets is not relevant here. The defendant asserted in the support case that he supplied all the funds for these assets. This claim is repeated in the complaint in equity. There was no lead suggesting that the wife and children could have purchased any of these assets with their own funds. In fact, all the tax returns of the defendant were joint

returns. Only one of these returns showed that the wife generated any income independently—the 1964 return on which she reported about $880 in earnings from a business partnership. The defendant himself testified in the support case that she never worked. The Government also introduced all the tax returns it could locate which were filed by the children. From all this evidence, the jury could properly have concluded that the net effect of the wife and children on the net worth computation for the defendant for any of the years under examination was *de minimis.* *United States v. Shy*, 383 F.Supp. 673, 676 (D.Del.1974).

If the wife or children had assets other than those indicated by the evidence, there were no leads as to where to look for them. They cannot be hypothesized out of nothing. The Government is not required, without leads to negate every possible source of non-taxable income. *Holland v. United States, supra,* 348 U.S. at 138, 75 S.Ct. 127, *Talik v. United States,* 340 F.2d 138, 140 (9th Cir. 1965).

Most importantly, however, none of these arguments confront the real estate investments which clearly were purchased with the defendant's funds and belonged to him alone.

### 4. *Omissions From the Net Worth Computation:*

■ The defendant argues that the Government's case must fail because it did not include all sources of funds in the opening net worth computation. It is not clear if the defendant is referring to the starting point in 1955 or the opening net worth in 1967. As to the starting point, the $10,000 figure is based, as we have seen, on the defendant's own estimate of the value of his car, stocks and bank accounts. The reason no other assets are included is because those are the only assets the defendant said he had. In other words, there were no leads to other assets as of that date. He complains that the opening net worth figure fails to include such personal property as household furnishings and insurance. But the cost of acquiring these assets would represent an expenditure which would only increase the negative cash position and thereby increase the amount of nontaxable income he would need before he could invest in the real estate. Similarly, capital withdrawals from partnership could not affect the Government's figures because, if it was profit, it would be reflected as adjusted gross income, and if it was a withdrawal of capital the cost of acquiring the asset in the first place would already have been reflected as an expenditure.

### C. *Net Worth in the Prosecution Years*

■ The defendant complains of two items which were included in his net worth for 1968 and 1969. The first of these is the $18,000 in the western savings Fund Society account. In the support proceeding, the defendant maintained that this was in escrow account, but that some of the funds there were his own. This account was not labeled "escrow," his accountant was not made aware of its existence, and part of one of his loans from First Federal was paid with a check drawn on this account. Therefore, the proper characterization of this account is foreclosed by the verdict of the jury, which heard argument on the subject.

The second item is the inclusion of assets of the wife and children as part of the defendant's net worth in 1968 and 1969. As we have seen, ownership of these assets is not relevant. The jury could have found that the defendant supplied all the funds from the defendant's testimony that his wife never worked, from tax returns listing her as a housewife, from other testimony and exhibits in which the defendant claimed to have supplied all funds for the children's assets, and from letters to Goodbody from the defendant showing that he played an active role in his wife's investments. Similarly, any profits from these assets would have been reported on the tax returns. There were no leads to profits, if any, not disclosed on the returns.

These assets were properly included in the computation where there was no evidence and no lead to their source other than the defendant himself. *Talik v. United States, supra,* 340 F.2d at 141.

Finally, there was no grievous error in the Government's computations with respect to the Revere Funds. In 1967, the defendant purchased $10,043.92 worth of these funds for his children. This was listed as an asset in 1967. In 1968, the defendant purchased $15,000 more of the funds and gave all the stock to his children. None of the stock is listed as being on hand as of December 31, 1968, but the gift is listed as an expenditure for 1968. Thus the defendant spent $15,000 for stock in 1968, and that is what the evidence showed. In other words, the $10,043.62 worth of Revere Funds purchased in 1967 is a wash item. It disappears from the stock on hand column at the end of 1968 along with the other Revere Funds purchased in that year. It reappears, not as an asset, but as an expenditure in the adjustments to net worth for 1968 as part of the $26,387.52 gift to the children.

Arguments over the weight of this evidence are now foreclosed by the verdict. *United States v. Kleinman,* 167 F.Supp. 870 (E.D.N.Y., 1958), relied on by the defendant, is not to the contrary. That case held that where bank deposits were in the name of another, the Government had to show by "affirmative proof" that the funds were supplied by the defendant. 167 F.Supp. at 873. There such affirmative proof was lacking. Here, it was not. Therefore, the case was for the jury.

D. *Willfulness*

■ The defendant argues there is no proof of willfulness because there were no badges of fraud such as those enumerated in *Spies v. United States, supra,* 317 U.S. at 499, 63 S.Ct. 364. In *United State v. Bishop,* 412 U.S. 346, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973), the Supreme Court attempted to clarify the definition of willfulness in the criminal tax statutes. It said that willfulness

was "bad faith or evil intent" to do the act proscribed by the particular statute, in this case, to attempt to evade or defeat payment of income taxes. 412 U.S. at 359–61, 93 S.Ct. 2008. This intent could be inferred from knowledge in the taxpayer that more income should have been reported, 412 U.S. at 360, 93 S.Ct. 2008, or from any conduct the likely effect of which is to mislead or conceal. 317 U.S. at 499, 63 S.Ct. 364. Here, such conduct was shown by the diversion of settlement checks without the knowledge of his accountant and by failure to keep records of all sources of income.

■ Willfulness is for the jury to decide. *Windisch v. United States,* 295 F.2d 531, 532 (5th Cir. 1961). The jury could have found willfulness from the following affirmative acts by the defendant which the evidence showed: (1) consistent and substantial understatement of income, *United States v. Burrell,* 505 F.2d 904 (5th Cir. 1974), *United States v. Lisowski,* 504 F.2d 1268 (7th Cir. 1974); (2) filing returns with knowledge more income should be reported, *United States v. Fahey,* 510 F.2d 302 (2d Cir. 1974), *United States v. Rischard,* 471 F.2d 105 (8th Cir. 1973); (3) failure to include all sources of income in his records, *Spies v. United States,* 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418 (1942); *Holland v. United States,* 348 U.S. at 139, 75 S.Ct. 127. *United States v. Tunnell,* 481 F.2d 149 (5th Cir. 1973), *cert. denied,* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974), reh. denied, 416 U.S. 963, 94 S.Ct. 1983, 40 L.Ed.2d 314 (1975), (4) understatement of income in prior years; *United States v. Colacurcio,* 514 F.2d 1 (9th Cir. 1975); and (5) overstatement of business expenses.

### IV.

The defendant contends that there were several errors at trial which entitle him to a new trial. These include statements by the trial judge either during the trial or in the charge, interruption of the jury's deliberations, sending the Government summaries out with the

jury, and alleged prosecutorial misconduct.

### A. *Statements by the Trial Judge:*

In his brief, the defendant cites numerous statements that he claimed prejudiced him. At the hearing, however, defense counsel pressed only one of these. As to the others, a careful reading of the transcript reveals that they have been lifted out of context and given a strained interpretation. The brief ignores other cautionary instructions to the jury, and therefore these contentions are not worthy of further comment.

■ The contention argued by counsel at the hearing was a portion of the charge which stated generally that an indictment is not evidence but an accusation which the defendant is called upon to answer. He objects that this is an improper comment on his Fifth Amendment privilege. The charge complained of is part of a general criminal charge which has been given probably to thousands of criminal juries over the years. This part of the charge refers of course to the defendant's duty to plead guilty or not guilty and has nothing to do with the Fifth Amendment. Any ambiguity that may have been created in the jurors' minds was cured a few moments later when the jury was instructed as to burden of proof and presumption of innocence. (N.T. 8–7–9).

### B. *Interruption of Jury Deliberations:*

■ The defendant objects to the fact that the jury was sent home for the evening. This has been the standard practice in this District in the circumstances of this case. No publicity surrounded the case. The hour was late. The jury was admonished to discuss the case with no one. (N.T. 8–49, 50). The following morning, the jury was asked if any of them discussed the case with anyone, and they all said they did not. (N.T. 9–3). In the light of *United States v. Piancone,* 506 F.2d 748, 750–51 (3rd Cir. 1974), and *Byrne v. Matczak,* 254 F.2d 525, 529 (3rd Cir. 1958), *cert. denied,* 358 U.S. 816, 79 S.Ct. 24, 3 L.Ed.2d 58 (1958), this contention is likewise not worthy of more discussion.

### C. *The Summaries:*

■ The defendant objects that the summaries prepared by the Government witnesses were allowed to go out with the jury. While it is true that the Supreme Court in *Holland, supra,* cautioned against the use of charts and summaries in net worth cases, 348 U.S. at 129–30, 75 S.Ct. 127, such summaries have been consistently approved when used not as evidence but as an aid to the jury, with guarding instructions. *United States v. Johnson,* 319 U.S. 503, 519, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943); *Gariepy v. United States,* 189 F.2d 459, 462 (6th Cir. 1951); *Smith v. United States,* 239 F.2d 168 (6th Cir. 1956), *cert. denied,* 353 U.S. 983, 77 S.Ct. 1281, 1 L.Ed.2d 1142 (1957) reh. denied, 354 U.S. 944, 77 S.Ct. 1422, 1 L.Ed.2d 1543 (1957); *United States v. Parenti, supra,* 326 F.Supp. at 728.

In this case the jury was instructed that the summaries were not evidence and could only be considered if they found there was competent evidence in the record to support the computations. (N.T. 8–26). The summaries themselves were cross referenced to the exhibits and testimony they purported to reflect, and the individuals who prepared them were subjected to searching cross-examination. The use of such summaries are particularly appropriate in a case like this that embraces a thirteen year period and myriad transactions in securities, bank accounts, savings certificate, and real estate. *See United States v. Parenti, supra,* 326 F.Supp. at 728.

■ The defendant objects that these summaries omitted some items and contained errors. This contention has been answered elsewhere and need not be restated. He also objects that the summaries contained evaluations of credibility, citing *Steele v. United States,* 222 F.2d 628 (5th Cir. 1958), and *United States v. Ward,* 169 F.2d 460 (3rd Cir. 1948) for the proposition that this is impermissible. However, the defendant does not point to any place in the transcript where the

Government witnesses passed on credibility. An independent review of the record does not disclose any place where either summary witness evaluated the credibility of any evidence. The only item which conceivably involved credibility was the Western Savings account. The defendant's contentions with respect to the account have likewise been considered elsewhere in this opinion and need not be restated. Otherwise, the record reveals that the Government accepted all the documentary and other evidence in the case at face value. Accordingly, the rule of law cited by the defendant does not appear to be relevant.

### D. *Prosecutorial Misconduct:*

The defendant objects to argument on summation that the people who pay taxes are the victims of people who evade their taxes (N.T. 7–100), and to an analogy between the crime of tax evasion and other crimes such as bank robbery and burglary (N.T. 7–99).

▮▮▮ The prosecutor is entitled to strike hard blows but not foul ones. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Statements made by the Assistant U. S. Attorney during the trial must be viewed in the "totality of the circumstances." *United States v. Newman,* 490 F.2d 139, 147 (3rd Cir. 1974). While some statements—such as those expressing an opinion on guilt based on facts not in evidence—are so inherently prejudicial as to *per se* require a new trial, *United States v. Schartner,* 426 F.2d 470, 478 (3rd Cir. 1970), the general rule is to determine case-by-case whether the defendant was actually prejudiced. *United States v. Somers,* 496 F.2d 723, 740–41 (3rd Cir. 1974), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Moreover, a prosecutor's remark made in reply to, or in rebuttal of, an improper inference suggested by defense counsel does not result in that prejudice which

requires a new trial. *United States v. Somers, supra,* 496 F.2d at 741.

▮▮▮ A careful reading of the summation arguments of both counsel reveals that the defendant suffered no prejudice by the prosecutor's remarks. Both remarks were made in the context of trying to explain the difference between a civil and a criminal tax action, and to argue that tax evasion is a serious crime. These arguments in turn were required to meet a defense strategy aimed at downplaying the crime and emphasizing the existence of a civil remedy for the Government. For example, at one point in cross-examination, defense counsel remarked, "So no matter which way it works out here he's still going to have to pay the piper in the civil case. Correct?" (N.T. 5–99). At another point he brought President Nixon into the case: "In the case of Nixon where he owed the Government $550,000 and he had false affidavits filed and everything, they merely went against him civilly. Isn't that correct?" (N.T. 7–78). Finally, on closing argument he attempted to prejudice the jury against the Internal Revenue Service by referring to news stories about personal files on taxpayers kept by the Service. (N.T. 7–142). Under the circumstances, therefore, the prosecutor's remarks were within the range of fair argument to answer these tactics.

### V.

The Court is of the same opinion as Judge Green that there is no merit to the defendant's motion to dismiss for preindictment delay, which was incorporated by reference in his brief on the post-trial motions.

There being no other grounds for granting either the motion for judgment of acquittal or the motion for a new trial, both motions are accordingly denied.